**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 01-50961**
**consolidated with**
**No. 02-50407**

_____

**JOHN WILLIAM ELLIOTT,**

**Petitioner-Appellant,**

**versus**

**JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
**INSTITUTIONAL DIVISION,**

**Respondent-Appellee.**

**Appeal from the United States District Court**
**for the Western District of Texas**
**(1:99-CV-606)**

July 25, 2002

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

John William Elliott, who received the death penalty in Texas state court, after being convicted of murder in the course of committing aggravated sexual assault, seeks a certificate of appealability (COA) to appeal the denial of federal habeas relief, raising over 20 claims, *inter alia*: for the federal proceedings, denial of an evidentiary hearing; and for the state proceedings, prosecutorial misconduct, failure to disclose exculpatory evidence,

_____

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

evidence insufficiency, inadequate jury instruction for the term "beyond a reasonable doubt", and ineffective assistance of counsel. In addition, Elliott appeals the denial of expert and investigatory assistance (funding) during the federal proceedings. **COA DENIED; FUNDING-DENIAL AFFIRMED**.

## I.

On 13 June 1986, Hanson invited eighteen-year-old Joyce Munguia to join a group of men in front of Elizondo's home. Also present were Elliott, Elizondo, and Ramirez. Over the next few hours, Munguia consumed beer, Everclear (grain alcohol), and cocaine. She became intoxicated and, later that evening, engaged in apparently consensual sexual relations with Elizondo in his house. Shortly thereafter, *according to Hanson*: Munguia was crying; her words were slurred; and her walking was impaired. Munguia asked Hanson to walk her home.

Also according to Hanson: as he began walking Munguia home, Elliott joined them and offered to help; Hanson told Elliott to leave; Elliott refused, claiming Hanson "just wanted her [Munguia] to himself"; after Munguia started to fall, Elliott picked her up and, over Hanson's protests, carried her into a dark, wooded area under a bridge; Elliott pulled down Munguia's shorts and Hanson asked him to let Munguia go; Elliott threatened Hanson, but began pulling Munguia's shorts up; Hanson started to walk off with Munguia when Elizondo and Ramirez arrived; Elliott then pulled

2

Munguia away from Hanson and raped her; Hanson left to call the police, but then returned to help Munguia, only to find Ramirez raping her; next, Elizondo raped her; the entire time, Munguia was crying and pleading for Hanson's help and said she was "going straight to the police when y'all get through".

Hanson further testified: after the rapes, Elliott told Elizondo, "We're going to have to get rid of her [Munguia]", then Elliott ran toward Elizondo's house; Hanson began helping Munguia with her clothes, but Elizondo took them from Hanson and said, "You too, Danny [Hanson]"; Hanson fled to call his sister to pick him up and had her call the police; Hanson returned to the scene later that night, saw Munguia's bloodied and still body, and left to call the police again.

*According to Elizondo*: Hanson and Ramirez left together to walk Munguia home; after Elizondo told Elliott he had just had sex with Munguia, Elliott left to join Hanson and Ramirez; shortly thereafter, Elizondo left to join them, arriving under the bridge to find Ramirez having sex with Munguia; Elliott had sex with Munguia after Ramirez, and Elizondo after Elliott; Munguia then asked for her clothes; no one responded; and Munguia threatened to call the police.

Also according to Elizondo: Elliott told him "he [Elliott] had to kill Joyce [Munguia] and Danny [Hanson]", that he was going to find a gun, and that Elizondo should stay to ensure they did not

get away; Elliott returned with a motorcycle chain belt wrapped around his fist and found Munguia searching for her clothes; Elliott struck Munguia with the chain; Munguia fell to the ground; and Elizondo ran away, turning to see Elliott strike Munguia three more times with the chain.

Police officers responded to Hanson's calls and located Munguia's body. They arrived at Elliott's house between 1:00 a.m. and 1:30 a.m. on 14 June. The shorts he was wearing were splattered with blood, as were his shoes.

The blood on Elliott's shorts matched the victim's blood type. The blood on his shoes could not be typed, but the patterns on the soles were consistent with those found at the murder scene. Sperm collected from the victim's body had the same blood type as *Elliott*, Ramirez, and Hanson.

During the autopsy, several metal fragments were recovered from the victim's head. At trial, a forensic chemist testified that one of the fragments matched the motorcycle chain belt in such detail that, in his opinion, it had once been part of it.

Elliott was convicted in January 1987 of murder in the course of committing aggravated sexual assault. At the punishment phase, the jury returned affirmative answers to the special issues; Elliott was sentenced to death.

The conviction and sentence were affirmed on direct appeal. ***Elliott v. State***, 858 S.W.2d 478 (Tex. Crim. App. 1993). The

4

Supreme Court of the United States denied *certiorari*. **Elliott v. Texas**, 510 U.S. 997 (1993).

Elliott applied for state habeas relief in April 1997, with supplemental applications that September. He claimed: prosecutorial misconduct (solicitation of perjury and evidence tampering); failure to reveal exculpatory evidence (of the claimed prosecutorial misconduct and insanity/incompetence); insufficient evidence of the murder's occurring in the course of a sexual assault; inadequate jury instruction for the term "beyond a reasonable doubt"; failure to instruct the jury on the number of years Elliott would have to serve in prison before becoming eligible for parole (if sentenced to life imprisonment); and ineffective assistance of trial and appellate counsel.

The habeas court (Elliott's trial court) did not hold an evidentiary hearing. Instead, it ordered the submission of affidavits from: the prosecutors, regarding the prosecutorial misconduct and exculpatory evidence claims; and Elliott's trial counsel, regarding the ineffective assistance at trial claims. The court also authorized Elliott to "submit affidavits from any person with respect to [those] claims or any other claims that he deems necessary".

In August 1998, that court entered findings and conclusions, recommending denial. In September 1999, the Court of Criminal

5

Appeals adopted those findings and conclusions and denied relief. *Ex Parte Elliott*, No. 42,654-01 (Tex. Crim. App. 1999).

Elliott filed for federal habeas relief in February 2000. (The State expressly waived the one-year limitations period for state prisoner federal habeas petitions, 28 U.S.C. § 2244(d).) The federal petition raised many of the claims asserted in the state petition. The case was referred to a magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(A) and FED. R. CIV. P. 72.

The State moved for summary judgment that July. That September, the magistrate judge granted Elliott's request for DNA testing. A stipulation submitted with the testing results indicated: Elliott could not be excluded as the donor of the sperm taken from the victim, when 99.99% of the population would be expected to be excluded; and the DNA profiles obtained from three bloodstains from Elliott's shorts were consistent with the profile generated from the victim. The magistrate judge ordered Elliott and the State to brief whether, in the light of the DNA tests or any other evidence, an evidentiary hearing was warranted.

Elliott filed briefs in support of an evidentiary hearing, although the precise issues for which that hearing was requested were not clear. "[E]rr[ing] on the side of inclusion", the magistrate judge scoured Elliott's briefs to identify the precise issues for which the hearing was sought. In a comprehensive 1

March 2001 order, the magistrate judge addressed each issue and concluded a hearing was not warranted.

The case was delayed because certain records from Elliott's state habeas proceedings had not been made part of the record on file with the district court. After receiving those records, as well as briefs on whether anything contained in them impacted his prior rulings, the magistrate judge denied Elliott's motion for further discovery.

That August (2001), in an extremely thorough, 53-page report and recommendation, the magistrate judge recommended granting the State summary judgment and denying habeas relief. That September, following review of Elliott's objections and a *de novo* review, the district judge accepted the report and recommendation and denied habeas relief. It later denied a COA.

## II.

Because Elliott filed his federal petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 100 Stat. 1214, it applies. **Martinez v. Johnson**, 255 F.3d 229, 237 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 1175 (2002). "Under AEDPA, a petitioner must first obtain a COA in order for an appellate court to review a district court's denial of habeas relief." **Dowthitt v. Johnson**, 230 F.3d 733, 740 (2000), *cert. denied*, 532 U.S. 915 (2001); *see also* 28 U.S.C. § 2253(c)(1)(A).

7

Appeals concerning 21 U.S.C. § 848(q)(4)(B), however, which provides for, *inter alia*, "investigative, expert, or other reasonably necessary services" in post-conviction proceedings to vacate or set aside a death sentence, do not require a COA. *See Clark v. Johnson*, 202 F.3d 760, 768 n.1 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).

"A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right". 28 U.S.C. § 2253(c)(2). This standard includes showing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further". *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted).

The ruling on whether a COA should issue "must be made by viewing ... [Elliott]'s arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)". *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001). Under that scheme, a federal habeas court must defer to the decision of a state court where it has adjudicated a claim on the merits, unless the state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or ... resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding". 28 U.S.C. § 2254(d)(1) & (2).

A state court decision is "contrary to [] clearly established Federal law, as determined by the Supreme Court of the United States ... if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts". *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision "involve[s] an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States ... if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case". *Id*.

For these questions, as well as whether the state court decision was based on an unreasonable determination of the facts in the light of the evidence presented in the state proceeding, we must presume the state court's findings of fact correct *unless* that presumption is rebutted by "clear and convincing evidence". 28 U.S.C. § 2254(e)(1).

A.

Elliott presents two groups of claims: certain rulings during the federal proceedings (*e.g.*, denial of funding for certain expert

9

and investigatory assistance and of an evidentiary hearing); and the state trial proceedings.  Over 20 issues are raised.

For Elliott's 37-page brief, 14 concern one issue — the district court's denial of an evidentiary hearing.  The brief lacks a statement of facts, is essentially devoid of record citation, consists largely of conclusional allegations and inference, and, for the most part, simply attempts to "incorporate[] by reference" papers from earlier proceedings in this case.  For example, regarding the underlying basis for a number of Elliott's claims, alleged prosecutorial misconduct, Elliott states: "The issue of prosecutorial misconduct has been briefed extensively and will not be briefed; however, the previous briefing is incorporated by reference."  A number of his issues have absolutely *no* briefing. In short, regarding those issues that require a COA, and other than to repeat the **Slack** standard, Elliott has made no effort to show that the issues are debatable among jurists of reason.

In its response, the State notes the inadequacy of Elliott's briefing and asserts that, as a result, his claims are abandoned. Elliott did *not* file a reply brief or otherwise attempt to correct any of the noted deficiencies.  (In the alternative, the State addresses the claims.)

It goes without saying that issues not properly briefed will not be considered.  *See*, *e.g.*, **Martin v. Cain**, 206 F.3d 450, 455 n.1 (5th Cir.), *vacated on other grounds*, 531 U.S. 801 (2000);

10

*Abbott v. Equity Group, Inc.*, 2 F.3d 613, 627 n.50 (5th Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994). Along this line, a party cannot simply incorporate by reference positions taken in district court; the issues must be briefed here. *See* **Peel & Co., Inc. v. Rug Market**, 238 F.3d 391, 398-99 (5th Cir. 2001). Issues not adequately briefed are deemed abandoned. *See, e.g.,* **Lamb v. Johnson**, 179 F.3d 352, 355 n.1 (5th Cir.), *cert. denied*, 528 U.S. 1013 (1999); **Yohey v. Collins**, 985 F.2d 222, 224-25 (5th Cir.), *cert. denied*, 498 U.S. 966 (1990); **Brinkmann v. Dallas County Deputy Sheriff Abner**, 813 F.2d 744, 748 (5th Cir. 1987).

In this light, we will discuss the one issue that is *arguably* adequately briefed — the denial of a federal evidentiary hearing.

But, even regarding this issue, there is significant uncertainty in the relief sought. To obtain an evidentiary hearing, "[a] habeas petitioner must make specific allegations; 'conclusory allegations unsupported by specifics[]' ... will not entitle one to ... a hearing". **Perillo v. Johnson**, 79 F.3d 441, 444 (5th Cir. 1996) (quoting **Blackledge v. Allison**, 431 U.S. 63, 74 (1977)).

This notwithstanding, the district court was "forced to scour [Elliott's] briefs and make its best guess as to the identity of the matters on which [Elliott] seeks the right to present evidence on his petition", because Elliott had failed to present "a clear statement of the claims on which [he] proposes to present evidence"

11

or "a brief summary of the anticipated evidence".  After an extremely liberal consideration of Elliott's briefing, the magistrate judge concluded that Elliott "*appear[ed]* to be requesting an evidentiary hearing" on seven issues, including "[w]hether the prosecution engaged in misconduct in eliciting allegedly false testimony [or] suppressing the testimony of ... Ramirez".  (Emphasis added.)

In his briefing here, Elliott fails to rectify these deficiencies.  It is not clear what evidence he seeks to produce, which claims the evidence will support, or how the evidence will support them.  Rather, Elliott complains that "the trial court judge was never able to hear from the witnesses who mattered most, ... Ramirez and his sisters".

We conclude that Elliott has appealed the denial of an evidentiary hearing *only* to the extent he sought a hearing to produce testimony from Ramirez and his sisters in support of his claims that "the prosecution engaged in misconduct in eliciting allegedly false testimony [or] suppressing the testimony of ... Ramirez".  Elliott contends "there were many unresolved factual issues that he had not been able to develop at state court and therefore an evidentiary hearing was required"; but, he fails to adequately brief any other factual issue or claim with respect to which he believes the district court erred by not holding an evidentiary hearing.

12

B.

"[W]hen '[t]he district court ha[s] sufficient facts before it to make an informed decision on the merits of [the habeas] claim' it does not abuse its discretion in failing to conduct an evidentiary hearing". *Barrientes*, 221 F.3d at 770 (second and third alterations in original; quoting *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998)); *see also* *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir.), *cert. denied*, 531 U.S. 957 (2000). Along those lines, there can be no abuse of discretion in such denial where the state habeas court has already provided petitioner with a full and fair hearing. *See* *id.* at 816; *Clark v. Johnson*, 202 F.3d at 766.

Even if the factual basis for a habeas claim has *not* been developed, AEDPA nevertheless precludes an evidentiary hearing under certain circumstances. "[W]here the failure to develop the factual basis is directly attributable to a decision or omission of the petitioner", the "petitioner's entitlement to an evidentiary hearing ... is restricted to the narrow exceptions of 28 U.S.C. § 2254(e)(2)". *Clark*, 202 F.3d at 765; *see also Williams v. Taylor*, 529 U.S. 420, 431-32 (2000). That subsection provides:

> If the applicant has *failed* to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —
>
> (A) the claim relies on —

13

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish *by clear and convincing evidence* that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).

Even where the basis for a claim remains undeveloped *through no fault of the petitioner*, or where the petitioner's claim satisfies one of the § 2254(e)(2) exceptions, the petitioner is not necessarily *entitled* to a hearing. *See* **Clark**, 202 F.3d at 765 ("[O]vercoming the preclusive effect of § 2254(e)(2) does not *guarantee* an evidentiary hearing[;] it only opens the door for one".); **McDonald**, 139 F.3d at 1059-60 ("[E]ven if [petitioner's] claim is not precluded by § 2254(e)(2), that does not mean he *is* entitled to an evidentiary hearing — only that he *may* be". (Emphasis in original.)). "Pursuant to Rule 8 of the Rules Governing § 2254 Cases, the district court retains discretion over the decision to grant an evidentiary hearing once a petitioner overcomes the barriers presented by § 2254(e)(2)". **Clark**, 202 F.3d at 765.

To show abuses of discretion in an evidentiary hearing denial, a petitioner must establish, *inter alia*, that "if proven true, his allegations would *entitle* him to relief". ***Murphy***, 205 F.3d at 816 (emphasis added); ***Clark***, 202 F.3d at 766 (emphasis added). As noted, the petitioner's claim must be based on specific — not conclusory — allegations of fact. He is not authorized a fishing expedition, *see* ***Ward v. Whitley***, 21 F.3d 1355, 1367 (5th Cir. 1994), *cert. denied*, 513 U.S. 1192 (1995); nor can he rely on "contentions that in the face of the record are wholly incredible", ***Blackledge***, 431 U.S. at 74.

1.

The state court provided Elliott a full and fair hearing on his claims and the district court had sufficient facts before it on which to make an informed decision on the merits of those claims. "A full and fair hearing does not necessarily require live testimony." ***Murphy***, 205 F.3d at 816 (citing ***Perillo***, 79 F.3d at 446-47). "We have repeatedly found that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying his claims, especially where as here, the trial court and the state habeas court were one in the same." ***Id.***

In support of his claims of solicitation of perjury and suppression of Ramirez's testimony, Elliott's state petition included a copy of a letter, apparently authored in 1987 by members of Ramirez's family for purposes of Ramirez's trial (he was

15

convicted of sexual assault). It states, in part: "The District Attorney, Carla Garcia has g[u]aranteed a 20 year sentence for our brother Pete Ramirez, who was not even present at the time the victim was murdered. Ms. Garcia wants our brother to change his statement in the order of which it will help her case." As noted, after reviewing Elliott's petition, including the Ramirez letter, the state habeas court ordered those prosecutors to submit affidavits regarding the alleged misconduct and directed Elliott to "submit affidavits from *any* person with respect to the above claims or *any other* claims that he deems necessary". (Emphasis added.)

Elliott submitted an affidavit from an investigator who had spoken with Ramirez and shown him a copy of the letter authored by his family. According to the affidavit, Ramirez told the investigator, *inter alia*, that: "Ms. Garcia wanted [Ramirez] to testify that he was present when the murder was committed"; "he refused the deal because he did not want to perjure himself"; "his refusal to testify against [Elliott] was because he 'did not want to get mixed up in the case' when he 'knew that the other guys were changing their stories'"; and "he did not take their plea [offer], so that he could stay out of the case". The investigator concluded: "The *implication* that the other guys [presumably Hanson and Elizondo] were lying was *evident* in the fact that [Ramirez] then stated that he was not willing to 'budge' from what he 'knew to be the truth'". (Emphasis added.)

16

The State submitted affidavits from the two former prosecutors. The first provides:

> I did not solicit false testimony of ... Ramirez, who participated in and was convicted for the sexual assault of Joyce Munguia, nor am I aware of any agent for the State of Texas who did solicit his false testimony. I negotiated a plea bargain agreement with ... Ramirez's attorney. The terms of the plea bargain agreement required ... Ramirez to provide the State with a complete and truthful confession regarding the sexual assault and murder of Joyce Munguia and that he pass a polygraph examination. If ... Ramirez met the conditions of the plea agreement, i[t] was ou[r] intention to call [him] to testify in the trial of John William Elliott.... Ramirez failed the polygraph examination. Consequently, I did not enter into a plea bargain agreement with his attorney and did not call ... Ramirez to testify in the trial of John William Elliott.
>
> ....
> The State did not conceal any solicitation of false testimony of ... Ramirez.

The second affidavit is substantially similar.

As is apparent, the record concerning Elliott's claims was well developed when the state habeas court ruled that "the controverted, previously unresolved factual issues material to the legality of [Elliott's] confinement c[ould] be resolved on the basis of the affidavits filed and personal recollection by this court and without a[ live] evidentiary hearing". It was in this light that the court made the following findings: "[t]he prosecutor ... negotiated for the testimony of [Elliott's]

17

codefendant, ... Ramirez, with the condition that Ramirez pass a polygraph examination regarding the truthfulness of his statements"; "Ramirez failed the polygraph examination; therefore, the negotiations ceased"; "[Elliott] has made no showing and has not filed or caused to be filed any affidavits of ... any ... witness with respect to his allegations of the solicitation of perjury or suppression of testimony by the state"; and "the prosecutors did not suppress such solicitation or suppression".

The district court had this record before it when it denied an evidentiary hearing. Moreover, in accordance with our admonition that, "[i]n determining whether an evidentiary hearing is proper, the district court may expand the record and consider affidavits, exhibits, or other materials that cast light on the merits of the petition", *McDonald*, 139 F.3d at 1060, the district court also considered a new affidavit from the same investigator who had spoken with Ramirez in 1997. It provides, in part: "When I spoke with [Ramirez's sisters who had signed the 1987 letter], they indicated that they did not remember anything about the letter that they had written regarding allegations that the State wanted ... Ramirez to testify to untruths at ... Elliott's trial."

That affidavit, coupled with the affidavits and letter that had been considered in the earlier state proceeding, comprised a well developed record on Elliott's claims. "The district court had sufficient facts before it to make an informed decision on the

18

merits of [those] claim[s]", *id*. at 1060; consequently, it did not abuse its discretion in denying an evidentiary hearing.

2.

Elliott appears to insist, however, that the factual basis for his claims was *not* well developed, through no fault of his own. Specifically, he asserts that, without a live evidentiary hearing, "the trial judge was never able to hear from the witnesses who mattered most, ... Ramirez and his sisters", particularly because Ramirez refused to prepare an affidavit. (The investigator's 1997 affidavit states that Ramirez's "reasons for not wanting to sign an affidavit ... or to be called to testify are because he fears that he will lose his job and upset his parents if his name appears in the newspapers and his involvement is made public".)

Elliott appears to contend he need not satisfy the narrow exceptions of § 2254(e)(2) because any failure to develop the factual basis of his claims is attributable solely to the state court's denial of an evidentiary hearing. (As the district court noted, Elliott "does not argue that he can meet the heightened burden of § 2254(e)(2)(A) & (B), and makes no such attempt to carry that stringent burden".)

Even assuming that the factual basis for Elliott's claims remains undeveloped, with the fault not being Elliott's, the district court still did not abuse its discretion in denying an evidentiary hearing. As noted, to show abuse of discretion,

19

Elliott must assert "specific allegations of fact", **Ward**, 21 F.3d at 1367, that, "if proven true,... would *entitle* him to relief", **Murphy**, 205 F.3d at 816 (emphasis added); **Clark**, 202 F.3d at 765 (emphasis added).

Concerning Elliott's claim that the prosecution entered into an agreement with Ramirez or intimidated him to keep him silent, the district court concluded: "[N]one of the hearsay statements in the [Ramirez family] letter or [investigator's] affidavit are inconsistent with the prosecutor's statement that the plea agreement with Ramirez required that he provide a full statement and pass a polygraph test, and that when he failed the test she declined to call him at trial"; and "[n]othing in the evidence already gathered supports the claim that prosecutors had an agreement with Ramirez to keep him silent — even Ramirez's statements do not support that claim".

Elliott does not address these points. Nor does he even *attempt* to suggest what Ramirez's testimony *might* be if called as a witness. As the district court concluded: "Clearly, Elliott has no idea what Ramirez will state under oath". Elliott's claim that the prosecution attempted to suppress Ramirez's testimony appears to be speculation; "[h]is request [for a hearing] in this regard is tantamount to an impermissible fishing expedition". *See* **Murphy**, 205 F.3d at 816. The district court did not abuse its discretion

20

in denying an evidentiary hearing to determine whether the prosecution attempted to silence Ramirez.

Regarding Elliott's claim that calling Ramirez (or his sisters) to testify in an evidentiary hearing would enable him to prove the prosecution knowingly presented perjured testimony (presumably from Hanson and Elizondo), the district court likewise did not abuse its discretion. "'To establish a due process violation based on the State's knowing use of false or misleading evidence, [a habeas petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false.'" ***Barrientes***, 221 F.3d at 753 (alteration in original; quoting ***Nobles v. Johnson***, 127 F.3d 409, 415 (5th Cir. 1997)).

Elliott does not even *identify* evidence presented by the State, much less make specific allegations that it was false, material, or known to be false. As the district court noted, "the only evidence that could conceivably support the speculation that the prosecutor elicited false testimony is an 'implication' that the investigator found to be 'evident' from what Ramirez told the investigator".

## C.

In the alternative, notwithstanding the wholly inadequate briefing by Elliott for the other COA requests, and pursuant to our review, there was no substantial denial of a constitutional right.

21

Therefore, Elliott is not entitled to a COA for any of those issues.  Likewise, there was no reversible error concerning the district court's denial of expert and investigatory assistance.

### III.

For the foregoing reasons, Elliott's request for a COA is **DENIED**, and the denial of funding for expert and investigatory assistance is **AFFIRMED**.

*COA DENIED; FUNDING-DENIAL AFFIRMED*